# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-20-00068-CR

**Nathan Wade Lucas, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 368TH DISTRICT COURT OF WILLIAMSON COUNTY
### NO. 18-2439-K368, THE HONORABLE RICK J. KENNON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

After a bench trial, the court found Nathan Wade Lucas guilty of aggravated assault with a deadly weapon, *see* Tex. Penal Code § 22.02(a)(2), and sentenced him to eight years in prison. In four appellate issues, he contends that (1) the evidence was insufficient to support findings that he used or exhibited a deadly weapon during the commission of an assault, (2) the court should have found in his favor on his defenses of mistake of fact and defense of a third person, *see id.* §§ 8.02(a), 9.33; (3) his sentence is unconstitutionally grossly disproportionate to his offense; and (4) trial counsel gave him constitutionally ineffective assistance by declining any more work by a forensic psychologist. We affirm.

## BACKGROUND

Lucas lived with his girlfriend, Jennifer Hood, on property owned by Hood's mother. The property was divided in half by a creek, with Lucas and Hood living on one side and Hood's mother's brother and his wife, Johnny and Lisa Leverett, living on the other. After Lucas

threatened to kill them during a dispute, the Leveretts moved away but continued to pay for their half of the property and receive mail there.

In fall 2018, Lisa Leverett picked her son up and drove to the property to check the mail. When she pulled up, she saw the gate to her half of the property unexpectedly opened and headlights near her trailer and suspected Lucas and Hood. She parked her truck so that it blocked an exit from that half of the property, told her son to call the police, and recorded all that followed with her phone camera. Lucas approached her truck; told her that she does not live there anymore, to "get the f— off the property," and that she had better leave or "he's going to kill [her]"; and banged on her rolled-up window. He then disappeared in the direction of the other half of the property, and his car's lights turned on over there. Soon after, Hood inched her car towards Leverett's parked truck. Hood's car bumped Leverett's truck twice.

After a few minutes, Lucas returned with what Leverett's son thought was a gun. It was in reality a golf club—a driver. Lucas believed that Leverett had rammed Hood's car because Hood told him so, and he swung the club into Leverett's windshield. He was standing near the front passenger side of the truck, and the club left a large crack in the windshield. Leverett did not see anything in his hands until after this first strike. Lucas then walked to the front-passenger window, next to where Leverett's son was sitting, and shattered the window with the club and yelled at Leverett to get out of the truck and again to leave the property. At some point the driver head of the club broke off. The club struck Leverett's son's arm, which started bleeding, either from the club or the broken glass or both. Lucas's strikes to the windshield and to the passenger window "scared [Leverett] badly," and she thought that he would make good on his statement that he would hurt her. She was afraid that he would hit her with the club and kill her or her son, who feared for his life himself. In response to all this, Leverett pulled her husband's

2

gun out of the truck's center console and briefly pointed it at Lucas, but she quickly put it back in the console as she did not know how to use it.

Lucas continued by approaching Leverett's driver's-side window, next to where she was sitting, and shattered it as well. She did not see the club in his hand anymore, but she thought that he shattered the window with the club or with another blunt object "because" on Lucas's second swing "it hit me in my head." Some of the broken glass gave her minor cuts.

The police arrived shortly after. One of the sheriff's deputies who responded saw the headless golf club. Based on his training and experience with dangerous situations, the deputy said that wielding a headless club while acting threateningly and aggressively less than two feet away is considered deadly force. The deputy also said that the club, with or without the head, was capable of causing serious bodily injury.

The State indicted Lucas for aggravated assault with a deadly weapon, and both guilt–innocence and punishment were tried to the bench. The court found Lucas guilty and sentenced him to eight years in prison. Lucas moved for a new trial, arguing that evidence tending to show his innocence was not adduced at trial and that the evidence was insufficient to support his guilt. After an evidentiary hearing, the court denied the motion. Lucas now appeals.

## DISCUSSION

### I. The evidence allowed the court to find beyond a reasonable doubt that Lucas committed aggravated assault and that his defenses were unavailing.

The standards for reviewing Lucas's first two appellate issues are intertwined. In his first issue, he attacks the sufficiency of the evidence to support the deadly-weapon element of aggravated assault, *see* Tex. Penal Code § 22.02(a)(2), contending both that there was no evidence that he was holding the golf club when he smashed the driver's-side window and that the club

3

could not have been a deadly weapon either once it lost its head or while Leverett was in the car with the windows rolled up.  In his second issue, he contends that he made a mistake of fact, *see id.* § 8.02(a), by believing that Leverett had rammed Hood's car, which he says supported his defense of defense of a third person, *see id.* § 9.33.

When assessing the sufficiency of the evidence to support a conviction, we apply the standards announced in *Jackson v. Virginia*, 443 U.S. 307 (1979): "we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt."  *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021) (citing *Jackson*, 443 U.S. at 318–19).  We must defer to the factfinder's credibility and weight determinations because it is the sole judge of witnesses' credibility and the weight to be given testimony.  *See id.*  In our review we may consider "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act."  *Id.* (internal quotations omitted) (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)).  "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction."  *Id.*  "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt."  *Id.* at 914–15.  "On appeal, the same standard of review is used for both circumstantial and direct evidence cases."  *Id.* at 915.

Similarly for defenses that the State must disprove beyond a reasonable doubt, if such a defense is raised by the evidence, we review both the factfinder's rejection of the defense and whether there was sufficient evidence to prove the offense under the *Jackson* standard.  *See*

4

*Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991); *Smith v. State*, 355 S.W.3d 138, 144–45 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). In a case involving such a defense, the factfinder's finding of guilt implies a finding against the defendant on the defensive theory. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Smith*, 355 S.W.3d at 144. Both mistake of fact and defense of a third person are defenses that if raised by the evidence the State must disprove beyond a reasonable doubt. *See* Tex. Penal Code §§ 2.03, 8.02(a), 9.02, 9.33; *Young v. State*, 542 S.W.3d 830, 836 (Tex. App.—Amarillo 2018, pet. ref'd); *Winkley v. State*, 123 S.W.3d 707, 712 (Tex. App.—Austin 2003, no pet.). The factfinder, like when deciding whether the elements of an offense have been proven beyond a reasonable doubt, "is free to accept or reject defensive evidence" when deciding whether the State has proven its case beyond a reasonable doubt despite the defensive theory. *See Winkley*, 123 S.W.3d at 712. If the factfinder could rationally have found against the defendant beyond a reasonable doubt on the defensive theory given all the evidence, we uphold the conviction. *See Saxton*, 804 S.W.2d at 914; *Smith*, 355 S.W.3d at 145–47; *Winkley*, 123 S.W.3d at 712.

The elements of the aggravated assault charged here are intentionally or knowingly threatening another with imminent bodily injury, which is an assault, and using or exhibiting a deadly weapon during the commission of the assault. *See* Tex. Penal Code §§ 22.01(a)(2), 22.02(a)(2); *Philmon v. State*, 609 S.W.3d 532, 536, 539 (Tex. Crim. App. 2020).[1] The indictment

---

[1] In a separate paragraph of the indictment, the State also charged Lucas with aggravated assault by causing bodily injury. Our conclusions are fully supported by the indictment's charge of aggravated assault by threat, so we need not address aggravated assault by causing bodily injury. *Cf. McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997) ("When a general verdict is returned and the evidence is sufficient to support a finding of guilt under any of the paragraph allegations submitted, the verdict will be upheld."); *Russo v. State*, 228 S.W.3d 779, 795 (Tex. App.—Austin 2007, pet. ref'd) ("Where different theories of the offense are submitted to the jury in the disjunctive, as in the instant case, a general verdict is sufficient if the evidence supports one

specified that the threat was accomplished "by smashing a window or windshield, or striking the vehicle [Leverett] was occupying" and that the deadly weapon was "a golf club, or blunt other instrument." Lucas's first issue focuses on the deadly-weapon element.

The evidence was sufficient to support that element. First, the evidence was sufficient to support a finding beyond a reasonable doubt that Lucas used or exhibited the golf club when he threatened Leverett by smashing the windshield and passenger window. In full context, Lucas's striking the windshield and passenger window were knowing threats of imminent bodily injury. Just before, he had told Leverett to leave the property, banged on her truck's window, and threatened to kill her. In that context, leaving to fetch a golf club then returning and swinging at the truck with it lead to the reasonable inference that he was showing that he would hurt or kill Leverett if she stayed. Indeed, his strikes against the windshield and passenger window, as Leverett testified, scared her "badly" and made her think that he would make good on his statement that he would hurt her. Relatedly, as her son testified, Lucas's strikes made her son fear for his life, so it is reasonable to infer that Leverett similarly feared for her life. She brandished the gun, it is reasonable to believe, because of this fear. Because the evidence showed an assault by threat before Lucas ever got to the driver's-side window and that he was using the golf club when striking the windshield and passenger window, the evidence was sufficient to show that he was using the golf club during the commission of the assault by threat.

His remaining argument about the deadly-weapon element is that the golf club did not constitute a deadly weapon either because its head fell off or because Leverett was safely in her truck with her windows rolled up, where the club could not hurt her. The class of items

of the theories. As the evidence is legally sufficient to support the theory of murder committed in the course of robbery, we need not address the second point of error." (internal citations omitted)).

6

constituting deadly weapons includes "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code § 1.07(a)(17)(B). The sheriff's deputy testified that the club, even without its head, was capable of causing serious bodily injury, so that finding was supported by sufficient evidence. Finally, the evidence showed that Lucas's use of the club could have hurt Leverett even with the windows rolled up. On the passenger side, either the club's or the broken glass's striking Leverett's son's arm caused it to start bleeding. And then on the driver's side, the club or another blunt object hit Leverett's head after Lucas used it to break the window. Thus, even with the windows rolled up, the manner of Lucas's use of the club—on the heels of a threat to kill Leverett, striking car windows with such force that the club or broken glass would also strike the person behind the window—was capable of causing serious bodily injury. *See Johnson v. State*, 509 S.W.3d 320, 324 & n.6 (Tex. Crim. App. 2017) (holding butter knife to be deadly weapon in its use and observing that deadly-weapon definition turns on "capability" of causing serious bodily injury, not on "probability" of doing so); *Blain v. State*, 647 S.W.2d 293, 294 (Tex. Crim. App. 1983) ("In determining the deadliness of a weapon the jury may consider all of the facts of a case, including words spoken by the accused."); *Lozano v. State*, 860 S.W.2d 152, 156 (Tex. App.—Austin 1993, pet. ref'd) ("Injury or wounds inflicted upon a person are factors to consider in addition to the manner of use in determining whether an object qualifies as a deadly weapon."); *Hammons v. State*, 856 S.W.2d 797, 801 (Tex. App.—Fort Worth 1993, pet. ref'd) ("[I]t is sufficient if the weapon . . . is displayed in a manner conveying an express *or implied* threat that serious bodily injury or death will result if the aggressor is not satisfied.").

Continuing our review under the *Jackson* standard, we now address Lucas's defensive theories, under his second appellate issue. He appears to misperceive how the defense

7

of mistake of fact applies. It applies only when it negates a mental-state element of an offense. *See* Tex. Penal Code § 8.02(a); *Fleming v. State*, 455 S.W.3d 577, 582 (Tex. Crim. App. 2014); *Celis v. State*, 416 S.W.3d 419, 430–31 (Tex. Crim. App. 2013). Thus, if a purported mistake of fact does not negate the defendant's mental state, it is unavailing as a defense. *See Fleming*, 455 S.W.3d at 582–83 (purported mistake of fact about victim's age inapplicable to statutory rape because that offense involves no mental state about victim's age); *Plummer v. State*, 426 S.W.3d 122, 127–28 (Tex. App.—Houston [1st Dist.] 2012) (purported mistake of fact about whether defendant was still peace officer did not apply because it did not negate defendant's having intentionally or knowingly possessed firearm), *reformed on other grounds and aff'd as reformed*, 410 S.W.3d 855 (Tex. Crim. App. 2013). Lucas says that he was mistaken about who rammed whose car—Hood rammed Leverett's, but he thought that Leverett had rammed Hood's. Because of this mistake, he argues, he was justified in threatening Leverett because he was protecting Hood. This theory does not negate the mental state for aggravated assault though: even under his purported mistaken belief, he still intentionally or knowingly threatened Leverett.

In any event, the evidence allowed the trial court to find beyond a reasonable doubt that the State had proven its case despite the defenses of mistake of fact and defense of a third person. The court was free simply to disbelieve Lucas's video-recorded accusation that Leverett had rammed Hood's car. *See Hammack*, 622 S.W.3d at 914; *Winkley*, 123 S.W.3d at 712. Without any ramming of Hood's car, no evidence showed that Hood was ever under threat of any force, so the court could have found beyond a reasonable doubt that Lucas committed aggravated assault and that his defenses were unavailing. *See Saxton*, 804 S.W.2d at 914; *Smith*, 355 S.W.3d at 145–47; *Winkley*, 123 S.W.3d at 712. We overrule Lucas's first and second issues.

8

## II. Lucas forfeited his gross-disproportionality issue.

In his third issue, Lucas contends that his sentence violates the Eighth Amendment because it is grossly disproportionate to his offense. But the State counters that he forfeited appellate review of that issue by not raising it timely in the trial court. *See, e.g.*, *Renfroe v. State*, 529 S.W.3d 229, 233 (Tex. App.—Eastland 2017, pet. ref'd) ("failure to raise Eighth Amendment issue in trial court or in motion for new trial fails to preserve error for appeal" (citing *Rhoades v. State*, 934 S.W.2d 113, 119 (Tex. Crim. App. 1996))); *Noland v. State*, 264 S.W.3d 144, 151–52 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (defendant forfeited appellate review of gross-disproportionality issue by failing properly to raise it in his motion for new trial or otherwise).

The trial court imposed Lucas's sentence in open court on January 13, 2020; it signed its judgment the same day; Lucas moved for a new trial on February 5; and he filed a corrected motion for new trial on February 13. Lucas's 30-day deadline for filing any original or amended motions for new trial thus was February 12, 2020. *See* Tex. R. App. P. 21.4(a), (b). All these events came and went without Lucas raising his gross-disproportionality issue. Then at the later hearing on the motion, Lucas sought to raise gross disproportionality, but both the court and State questioned whether he could do so because his motion and corrected motion lacked any reference to that issue and his 30-day deadline had long passed. On appeal, Lucas's only argument for why his gross-proportionality issue was not forfeited is:

> The exigencies and delays occasioned by the pandemic might hopefully provide some equitable relief here, and the excessiveness or disproportionality of a sentence is hardly at the same level of complexity as other substantive claims. Appellant recognizes . . . that the issue was not raised at trial or in the text of the motion for new trial. However, relief is prayed for as a *sua sponte* matter as the sentence was excessive given the lack of significant personal harm to any complainant.

The COVID-19 State of Disaster declared by the governor began on or about March 13, 2020. *See* The Governor of the State of Tex., Proclamation 41-3720, 45 Tex. Reg. 2094, 2094–95 (2020); First Emergency Order Regarding the COVID-19 State of Disaster, Misc. Docket No. 20-9042 (Tex. Mar. 13, 2020), Misc. Docket No. 20-007 (Tex. Crim. App. Mar. 13, 2020). So while he argues that the disaster should be grounds for considering his late-raised issue, he needed to raise the issue a month before the disaster began. We hold that he forfeited this appellate issue.

### III. Lucas has not shown deficient performance necessary to show constitutionally ineffective assistance of counsel.

In his fourth issue, Lucas contends that his trial counsel gave him constitutionally ineffective assistance because counsel declined to pursue continued psychological and neuropsychological testing with a forensic psychologist, which could have provided evidence to ward off a long prison sentence. About 10 months before Lucas's trial, his trial counsel obtained a referral to the forensic psychologist, who reviewed some of Lucas's medical records and performed some preliminary testing on him. The forensic psychologist's preliminary work led him to make two kinds of observations about Lucas—Lucas might suffer from several, significant, and complex psychological and neuropsychological problems, but he also might be exaggerating his symptoms and even be malingering. The forensic psychologist thought that further testing could confirm or rule out any malingering, which if ruled out would allow him to reach some reliable results about Lucas's conditions. But Lucas's trial counsel declined to pursue any further work by the forensic psychologist, explaining, "Well, because he's malingering, I will present the records—mental health records to the Court," which he did during the punishment hearing.

To establish a claim of Sixth Amendment ineffective assistance of counsel, a defendant must establish both of two prongs—deficient performance and resultant prejudice to the

10

defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). It is the defendant's burden to make both showings. *See Ex parte Andrus*, 622 S.W.3d 892, 899 (Tex. Crim. App. 2021). Deficient performance is difficult to show: "It is not sufficient that the appellant show, with the benefit of hindsight, that his counsel's actions or omissions during trial were merely of questionable competence. Rather, the record must affirmatively demonstrate trial counsel's alleged ineffectiveness." *Johnson v. State*, 624 S.W.3d 579, 585 (Tex. Crim. App. 2021) (internal quotation omitted) (quoting *Mata v. State*, 226 S.W.3d 425, 430 (Tex. Crim. App. 2007)). "The defendant must overcome 'the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance' and that the conduct constituted sound trial strategy." *Id.* at 586 (quoting *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999)). "For an appellant to defeat this presumption, '[a]ny allegation of ineffectiveness must be firmly founded in the record and the record must affirmatively demonstrate the alleged ineffectiveness.'" *Id.* (quoting *McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996)).

"Trial counsel should generally be given an opportunity to explain his actions before being found ineffective." *Id.* "In the face of an undeveloped record, counsel should be found ineffective only if his conduct was 'so outrageous that no competent attorney would have engaged in it.'" *Id.* (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)). A record "that provides no explanation for counsel's actions will not overcome the strong presumption of reasonable assistance." *Id.* "Thus, if the record does not contain affirmative evidence of trial counsel's reasoning or strategy, we presume counsel's performance was not deficient. *Id.* "[C]ourts may not find deficient performance from a silent record if there is any reasonable strategy that might support counsel's decision." *Id.* "Counsel gets the benefit of the

11

doubt from a silent record, and courts must assume that counsel had a strategy if any reasonably sound strategic motivation can be imagined." *Id.*

The record is silent about why trial counsel declined any more psychological and neuropsychological testing for Lucas in favor of simply offering his medical records as evidence during sentencing. Lucas argues that the State could have called his trial counsel to testify at the new-trial stage, but making a sufficient deficient-performance showing was Lucas's burden. Without evidence about why trial counsel declined any more work by the forensic psychologist, we must not conclude that counsel's performance was deficient unless counsel's choice was so outrageous that no competent attorney would have made it. *See id.* We conclude that counsel's choice was not so outrageous—we can "imagine[]," *see id.*, defense counsel declining to present evidence of a defendant's psychological and neuropsychological conditions when there is a possibility, as here, for effective cross-examination by a prosecutor that the defendant is in reality simply malingering. We therefore hold that Lucas has not made the required showing under *Strickland* and overrule his fourth issue.

**CONCLUSION**

We affirm the trial court's judgment.

_____

Chari L. Kelly, Justice

Before Justices Goodwin, Triana, and Kelly

Affirmed

Filed: November 9, 2021

Do Not Publish

12